## Case No. 3,265.

COSTIGAN et al. v. WOOD.

[5 Cranch, C. C. 507.][1]

Circuit Court, District of Columbia. Nov. Term, 1838.

EJECTMENT BY VENDOR AGAINST VENDEE IN POSSESSION.

THE COURT (CRANCH, Chief Judge, contra) gave the instruction.

## Case No. 3,266.

COSTIN v. WASHINGTON.

[2 Cranch, C. C. 254.][1]

Circuit Court, District of Columbia. Oct. Term, 1821.

CONSTITUTIONAL LAW—CHARTER OF CITY OF WASHINGTON—RESIDENCE OF PERSONS OF COLOR.

The clause in the charter of Washington which gives power to the corporation "to prescribe the terms and conditions upon which free negroes and mulattoes may reside in the city," is applicable only to those persons of color who come to reside in the city after the promulgation of such terms and conditions. That clause in the charter is not, in itself, repugnant to the constitution of the United States; nor is the by-law of the 14th of April, 1821, c. 133, in its prospective operation.

This was an appeal from the judgment of a justice of the peace of the county of Washington for the penalty of five dollars under the 7th section of the by-law of the corporation of Washington, passed on the 14th of April, 1821, c. 133, entitled "An act to prescribe the terms and conditions upon which free negroes and mulattoes may reside in the city of Washington, and for other purposes." The first section requires the city commissioners to give notice to all free persons of color in their respective wards to appear before the mayor within thirty days from the time of such notice wth their evidence of freedom, and subscribe a statement of their trades, or means of subsistence, and of their family. The third section requires every free negro or mulatto, at the time of his appearing before the mayor, according to the first section, to produce a satisfactory certificate from three respectable white inhabitants, householders in his neighborhood, as to his living peaceably, his means of subsistence, and his character. The fifth section

[1] [Reported by Hon. William Cranch, Chief Judge.]

requires every free male colored person, who then resided in the city of Washington, whose evidence of freedom should be found satisfactory to the mayor, "to enter into bond with one good and respectable white citizen, as surety in the penalty of twenty dollars, conditioned for the good, sober, and orderly conduct of such person or persons of color, and his or her family for the term of one year, and that such person or persons, his or their family, nor any part thereof, shall not, during the said term of one year, become chargeable to the corporation in any manner whatsoever, and that they will not become beggars in or about the streets," &c., whereupon they shall obtain a license to reside, &c. The 7th section imposes a penalty of five dollars on every person of color, who may have been notified as aforesaid, who shall be found residing within the limits of the city after the expiration of the thirty days aforesaid, without having entered into the bond and obtained the license as aforesaid, for the first week he may continue so to reside.

Mr. Caldwell, for appellant.
Mr. Law, for appellee.

CRANCH, Chief Judge. The ground of the judgment of the justice of the peace, in the present case, is, that the defendant was found residing, and had continued to reside one week, within the limits of the city after the expiration of thirty days from the time of the notice given to him, according to the provisions of the first section of the by-law, without having entered into the bond, and obtained the license agreeably to the provisions of the fifth section. On the part of the appellant, it has been contended, 1st. That the by-law is not authorized by the charter; and 2d. That if it is, the charter is, in that respect, repugnant to the constitution of the United States.

1. Upon the first point, it is said that the clause in the charter must be construed prospectively, and not retrospectively. That it could not reasonably be supposed to be the intention of congress to banish old and long-established inhabitants of the city who have acquired real estates therein, whose lives have been unexceptionable, who can neither be reproached for, nor suspected of any crime. Such a construction of the charter would abolish the distinction between moral good and evil; would inflict punishment on the innocent, and would take away the incentive to good conduct. That the process to require surety for good behavior was a criminal process; and that, at common law, such surety could only be demanded upon conviction of some offence. That it is not reasonable to suppose that congress intended that color alone should be a good cause for demanding it. That the constitution knows no distinction of color. That all who are not slaves are equally free; that they are equally citizens of the United States, as those free white persons in Virginia who have no freehold, or those in the other states who have not the property required to qualify them to vote or to serve on juries, or who are too aged to be enrolled in the militia. That those people of color, who are citizens of any state in the Union, have a right to come here and claim all the privileges of citizenship under that clause of the constitution which gives to the citizens of each state all the privileges and immunities of citizens in the several states. That to cause a warrant to issue for surety of good behavior or of the peace, without an allegation of some crime actually committed, or of the apprehension of some crime, supported by oath, or affirmation, would be contrary to the constitution of the United States, and therefore the charter must not be construed so as to give that power.

2. On the 2d point, it is said, that if the charter is capable of such a construction as to warrant the by-law, the reasons which have been urged to show that such a construction is inadmissible, show also that the charter, in that respect, in unconstitutional. But in answer to this position it may be said, that if those reasons are not sufficient to show that the by-law is not warranted by the charter, they are not sufficient to show that the charter is unconstitutional; for before the by-law can be warranted by the charter, the charter itself must be shown to be warranted by the constitution. And if the constitution prescribes any limits to the terms which the corporation may impose upon free persons of color as the condition of their residence in the city, they are bound by those limits, however broad may be their charter. The clause in the charter does not, in itself, seem to be repugnant to the constitution. The power, given by that clause, may be so exercised by the corporation as not to violate any right secured by the constitution. The only question, then, is, whether the by-law itself is unconstitutional. What constitutional right does it violate? It is said that the constitution gives equal rights to all the citizens of the United States, in the several states. But that clause of the constitution does not prohibit any state from denying to some of its citizens some of the political rights enjoyed by others. In all the states certain qualifications are necessary to the right of suffrage; the right to serve on juries, and the right to hold certain offices; and in most of the states the absence of the African color is among those qualifications. Every state has the right to pass laws to preserve the peace and the morals of society; and if there be a class of people more likely than others to disturb the public peace, or corrupt the public morals, and if that class can be clearly designated, it has a right to impose upon that class, such reasonable terms and conditions of residence, as will guard the state from the evils which it has reason to apprehend. A citizen of one state,

coming into another state, can claim only those privileges and immunities which belong to citizens of the latter state, in like circumstances. But the present case is like that of a state legislating in regard to its own citizens, and I can see no reason why it may not require security for good behavior from free persons of color, as well as from vagrants, and persons of ill-fame. The clause of the constitution which requires that warrants should be founded upon probable cause, supported by oath or affirmation, does not apply to the warrant in this case, which was for a debt due as a penalty for the violation of a by-law. But it is said that the charter does not apply to those free negroes and mulattoes who were residing in the city when the charter was granted. No law ought to be construed to have a retroactive effect unless the intention of the legislature be clear. The words of the charter, in this respect are equivocal. They are, "To prescribe the terms and conditions upon which free negroes and mulattoes may reside in the city." The word "prescribe" is prospective, and seems to imply that the rule is to be applied only to those who should come to reside in the city after the promulgation of the rule. It would seem to be unreasonable to suppose that congress intended to give the corporation the power to banish those free persons of color, who had been guilty of no crime, and who, by their residence had acquired a right to support under the poor-laws. Many such persons had been long residents of the city; some had been born there; had been useful members of society; had acquired property, and had contributed to the growth and improvement of the city, and had paid taxes for the support of the poor. They could not compel any white person to become their surety; and banishment would be the consequence of their inability to give the security required; unless they should submit to repeated imprisonments in the workhouse, and to the breaking up of their families, the ruin of their business, and the binding out of their children, by the guardians of the poor. If such had been the intention of congress they might have expressed it by using equivocal terms; as they have not, I feel myself bound, by the ordinary rules of construction, to say, that the charter only authorizes the corporation to prescribe the terms and conditions of residence for those persons of color who should come to reside in the city after the promulgation of such terms and conditions. In the present case the appellant was a resident of the city at the time of the charter, and has continued to reside there ever since, and therefore was not a person in regard to whose residence the corporation had, by the charter, a power to prescribe terms and conditions; and consequently was not liable to the penalty of the 7th section of the by-law. I am, therefore, of opinion that the judgment ought to be reversed with costs. Judgment reversed, with costs.

COSTS AND FEES. See Append. Fed. Cas.

COSTS AND FEES IN PRIZE CASES. See Append. Fed. Cas.

COSTS, FEES AND COMPENSATION IN PRIZE CASES. See Append. Fed Cas.

COSTS IN CIVIL CASES. See Append. Fed. Cas.