CHARLES W. DABNEY, JR. *vs.* NEW ENGLAND MUTUAL MARINE
INSURANCE COMPANY.*

If in the course of a voyage the master of a vessel falls in with a ship in distress and about
to sink, and, having no room for her passengers and crew without throwing over a part of
his own cargo, consents nevertheless to receive them on board in order to save their lives,
and accordingly begins to throw over cargo at once, before any of them come on board,
and continues it while they are coming on board, until sufficient room for them all has
been thus gained, this will not entitle the owner of the vessel to recover, upon his policy,
for a general average contribution. CHAPMAN and FOSTER, JJ., dissenting.

CONTRACT upon a policy of insurance on the bark Fredonia,
issued to the plaintiff by the defendants, to recover a sum of
money as general average for throwing over a part of a cargo of
fruit belonging to the plaintiff. The following facts were agreed
in the superior court:

The bark Fredonia, Captain Edmund Burke, sailed on a
voyage from Fayal to Boston, loaded with fruit and oil, on the
13th day of December 1865, and at daylight on the 1st day of
January 1866 came in sight of a ship about five miles distant,
and bore down and spoke her, and found her to be the ship
Gratitude, bound from Liverpool for New York, with cargo and
passengers, and was informed by her master that he had lost his
heavy sails the day before, and was under close-reefed topsails.
At about half-past three of the same day all hands were called
to 'bout ship, as the Gratitude had her ensign set in distress.
The Fredonia ran down, and persons on board of the Gratitude
told the master of the Fredonia that the Gratitude sprang a leak
on Christmas day; had thrown over three hundred tons of
cargo; leaked worse that afternoon; and they wished the Fre-
donia to lie by. The master of the Fredonia said that he had a
perishable cargo, but would keep company till morning, and
northwest was decided upon as the course for both ships to
steer. The night of January 1st it blew heavily from the south-
ward, and the ship was lost sight of till ten o'clock of the 2d,

---

* This case was argued in November 1866.

when it was still blowing heavily, and she was seen from the Fredonia, with her ensign set in distress. The Fredonia bore down, and persons on board of the Gratitude wanted to know if the Fredonia had water enough for three hundred passengers, and wished her to lie by them. The master of the Fredonia said that he would lie by them; but in the afternoon told them to wear ship and follow him. They again asked if the Fredonia would lie by them, and the master answered that she would. That night the wind was not very strong; the Fredonia kept two or three miles ahead, and at daylight, on the 3d, the Gratitude had no signal of distress, and the Fredonia made all sail till half-past seven o'clock, A. M., when the ensign was seen set to the foretop-gallant masthead of the Gratitude in distress. The Fredonia ran down, hove aback, saw they had two boats to the crane and one in the water. The mate of the Gratitude came on board of the Fredonia, and asked the master to take off the women and children. The master took the mate into the cabin and questioned him as to the condition of the Gratitude, and the mate represented that the pumps had been going for seven days, the passengers and crew were worn out with pumping, and the ship was in a sinking condition. The master did not assent to take off any person, but told him they were comfortable on board of their own ship; he could not take them; they would perish if they came on board. The mate of the Gratitude returned to his ship, and came back to the Fredonia in a boat with some of the crew and passengers. They begged the master of the Fredonia to take them off; said they were beat out with pumping; and prayed the master to save their lives. The mate further stated that the forward pumps had given out, and the ship must go to the bottom. The master of the Fredonia then told the mate of the Gratitude that he would take them; they must fetch provisions and water; the mate of the Gratitude said they had plenty and would fetch it; and said mate and passengers then gave three cheers, and went back to their ship. The master of the Fredonia then gave orders to his mate to clear the oranges out from between decks, so as to make room for the passengers; some oranges were got out and thrown over

before the first passengers came on board; the women and chil-
dren came first, at about nine o'clock in the morning; the master
of the Fredonia had to keep them on deck, it raining heavily,
until room could be made between decks, and after the second
boat load came on board they were taken down. There were
four boats going or coming, and the passengers came on board
of the Fredonia faster than the fruit could be got out of her; it
had to be passed out of the hatches, and the decks were full all
the time. It was not possible to handle the ship with the pas-
sengers on deck. Three hundred and twenty persons came on
board from the Gratitude, and there was room for about one
hundred and fifty to stand on deck. All were aboard at half-
past four, and the throwing over of the cargo stopped about
half-past two. The houses on deck were full; there was not
room for the people between decks to lie without lapping over,
and there was no other place to put them, except the hold,
which was full of cargo. The master of the Fredonia made full
inquiries of the mate of the Gratitude and of the passengers who
came alongside, and was satisfied that the ship was in a sinking
condition, and that it was indispensably necessary to throw over
that portion of the cargo, or to leave the passengers and crew of
the Gratitude to go down with the ship.

Upon these facts, judgment was ordered for the plaintiff; and
the defendants appealed to this court.

*H. C. Hutchins,* for the defendants, cited Millar on Ins. 331–
334; Hopkins on Average, 6–8; 2 Arnould on Ins. 878, 882; 1
Parsons Mar. Law, 286, 288, 324, 325; 2 Ib. 621; Abbott on
Shipping, (5th Amer ed.) 491, *n.,* 503, 571; Benecke, 220, 221;
3 Kent Com. (6th ed.) 239; *Peters* v. *Warren Ins. Co.* 1 Story
R. 463, 469; *The Ann D. Richardson,* Abbott Adm. R. 499;
*Weston* v. *Train,* 2 Curtis C. C. 49, 59; *Whitteridge* v. *Norris,*
6 Mass. 125; *Warder* v. *La Belle Creole,* 1 Pet. Adm. 40; *The
Zephyrus,* 1 W. Rob. 329; *The Emblem,* Daveis, 61; *Sturtevant*
v. *Nicholaus,* 1 Newb. Adm. 449; *The Aid,* 1 Hagg. Adm. 83;
*The Bartley,* Swabey Adm. 198; *The Coromandel,* Ib. 205; *The
Johannes,* Lushington Adm. 182.

*B R Curtis & F. E. Parker,* for the plaintiff. If a vessel

sails on a voyage, seaworthy for that voyage, and while in mid ocean, without any fault of the owner, master or crew, becomes unable to continue that voyage, and her ability to continue can be and is restored by a jettison, and her voyage is completed, such jettison is in contemplation of law caused by a peril of the sea; and a claim for general average contribution may be founded thereon. *Lawrence* v. *Minturn,* 17 How. 100.

In the present case, the peril was caused by a number of passengers so great as to prevent the working of the ship and render her unseaworthy. This peril was occasioned by the master's taking more than three hundred persons from the ship Gratitude, then apparently in a sinking condition, whom he received on board at their earnest and repeated request, after inquiring of the first officer and certain of her passengers and crew, and upon his judgment, formed on such inquiry, that it was the only means of saving their lives. The inquiry therefore arises whether it was a fault of the master to consent to receive such a number of shipwrecked persons as would render his vessel unseaworthy without a jettison. Will the law deem his conduct to be a fault? To risk one's own property in order to save another's life is in law a duty of imperfect obligation, the performance of which the law cannot enforce, but which it is its policy to encourage, and to hold valid when done. See *The Boston,* 1 Sumner, 328; *The Henry Ewbank,* Ib. 425; *Mason* v. *The Blaireau,* 2 Cranch, 267. The same moral constraint which operates on a master to go out of his course, also operates on him when he has reached the scene of disaster, to do what he can to relieve the necessities of the shipwrecked. But going out of the regular course to succor the distressed is no deviation. 1 Phil. Ins. §§ 1025, 1027. *Box of Bullion,* 1 Sprague's Decis. 57. *Crocker* v. *Jackson,* Ib. 142. *Perkins* v. *Augusta Ins. & Banking Co.* 10 Gray, 312.

If then it is not a fault to receive shipwrecked persons on board, were there any circumstances in this case to affect the general rule? It is immaterial that the throwing over began before the passengers came on board. If the master's decision to receive them was a lawful decision, and it was certain that the

reception of them would make his vessel unseaworthy without such throwing over, then he might proceed to do it at once. An act done in view of a peril certain to occur is occasioned by that peril. And when it appears that the master did not act a moment too soon, the case becomes irresistibly strong.

But it is said that the sacrifice was made to save life. In a metaphysical view, it may be conceded that the master's determination to receive these persons on board was the cause of the throwing over; or rather, that the moral constraint operating on his conscience was the original cause. But this involves a pretty long chain of reasoning. The law should regard only the immediate cause, which was, to restore the seaworthiness of the vessel. If it is found that the loss arose from a peril of the sea, which was its immediate cause, the law should not look behind to see what occasioned that peril of the sea.

BIGELOW, C. J. The precise question which this case presents for adjudication is a novel one, but we think that its solution can be satisfactorily reached by the application of a few well settled principles of law to the admitted facts.

The claim of the plaintiff is to recover on a policy of insurance on a vessel belonging to his principal, in whose behalf this action is brought, a contribution to general average for a jettison of a portion of the cargo. It seems to be conceded by both parties, that the controversy between them as to the validity of this claim turns entirely on the determination of the question, whether the destruction of part of the cargo was made under such circumstances as to constitute a general average loss. The elements necessary to establish a valid claim for such a loss against an insurer are too familiar and well settled to be the subject of controversy. It must be made to appear that there was a peril of the sea impending over the subject insured; that a voluntary sacrifice of property on board was made for the purpose of escaping such peril; and that safety from the imminent danger was thereby secured.

In the application of this rule to the present case, a preliminary inquiry suggests itself. It is a rule of the law of insurance, as settled in this commonwealth, that in addition to the implied

warranty of seaworthiness which applies to the condition of the vessel at the commencement of the voyage, and which must be strictly complied with, it is also an obligatory duty on the part of the insured to keep her during the voyage insured in a suitable condition for the service in which she is engaged; and if he fails to do so, either through his own neglect or by the fault of his agent the master, and a loss happens which is attributable to that cause, the assured and not the underwriters must bear it, because it is a breach of his implied undertaking. *Copeland* v. *New England Ins, Co.* 2 Met. 432, 439. Without going into the vexed question as to the nature or kind of negligence or fault on the part of a master in the course of a voyage, which will absolve the underwriters, we suppose it may be stated as beyond controversy, that if a master, in the absence of fraud, through a mistaken sense of duty, deliberately does an act the necessary consequence of which he knows will be to render his vessel unseaworthy for the voyage insured, and no real necessity or valid justification is shown to exist for the act of the master, such conduct would be a breach of the implied undertaking by the assured, and would defeat any claim under the policy based on a loss happening by reason of the unseaworthiness thereby created. For example; a master could not without a valid excuse lawfully go out of the course of his voyage and change the condition of his vessel by taking passengers on board at an intermediate port in such numbers as to be clearly beyond the capacity of his vessel, and thereby render her innavigable. The unseaworthiness which such conduct would create would be a clear breach of contract; and if in such case a jettison was made in order to restore the navigability of the vessel and render her seaworthy, it would be in consequence of the fault of the master, and furnish no ground for a claim by the owners of the vessel for a general average contribution. The answer to any such claim would be, not that the jettison was not caused by a peril of the sea, but that there had been a violation of the undertaking to preserve the seaworthiness of the vessel, to which the jettison was attributable, which defeated the right of the insured to recover on his policy.

But, on the other hand, it is equally clear that if a vessel sailed on a voyage in a seaworthy condition for the voyage, and while in mid ocean, by the operation of circumstances which involved no fault or breach of duty by the master, she became innavigable and unseaworthy and unable to continue on her course, and her capacity for the further prosecution of the voyage could be restored only by a jettison of part of the cargo, which was made accordingly, and the voyage subsequently completed in safety, such jettison would in contemplation of law be deemed to have been caused by a peril of the sea, and to constitute a good ground for a claim for a general average contribution. This would be so certainly, if the jettison could be properly deemed to have been made in consequence of the unseaworthy condition of the vessel, and for the purpose of restoring her to a navigable condition.

It cannot be denied that the destruction of part of the cargo in the present case was a consequence which resulted from and was occasioned, either proximately or remotely, by the act of the master in stopping to afford succor to another ship which he had overtaken on the high seas, and in receiving on board his own vessel the passengers and crew of such ship. Nor can it be doubted that these acts were rendered necessary in order to save the lives of the persons so received on board; the ship in which they were embarked being in a sinking condition, and liable at any moment to go down with all on board. Was it justifiable and lawful for the master thus to delay in the course of his voyage, and to receive into his own vessel such a number of ship · wrecked passengers and crew as might compel him to sacrifice a portion of his cargo? To this question but one answer can be made consistently with the common principles of humanity, and that sacred regard for human life which ought to prevail in every civilized and Christian community. Although it is true that there was no legal obligation resting on the master to deviate from his course on seeing signals of distress from the sinking ship, and to succor her crew and passengers from the danger which was immediately impending over them, still there was resting upon him the moral obligation, to which no man

whatever may be his condition and situation, ought ever to be insensible, of relieving, so far as was in his power, the distress of his fellow-men. It may not be within the province of law to enforce obligations of such nature, but the observance of them is for this reason none the less binding *in foro conscientiæ.* The question is not what shall be required and exacted of a man under such circumstances, but what is he in duty bound to do. And this, when done, the law will justify and hold valid, although it could not have compelled its performance. It certainly would be a reproach to the administration of justice, if the rules of law required us to hold that a man ought to forego the fulfilment of his moral duty in order to comply with his legal obligations, or that it is to be imputed to him as a fault that he yielded to the plainest dictates of humanity, in endeavoring to rescue his fellow-mortals from protracted suffering, and from the peril of imminent death. The rules of law impose no such cruel or unreasonable constraint on the conduct of the master. On the contrary, it is an established principle that he does not violate his trust or exceed his authority by using efforts to give aid and succor to those whom he may find in the course of his voyage in danger and suffering on the high seas, although by so doing he may expose his vessel and the property on board to new and additional risks and consequent loss. It is on this ground that it is held that a deviation may be justified if made for the purpose of alleviating the distress or administering to the necessities of persons lawfully on board the vessel insured, or of giving relief to strangers suffering from the disaster of a wreck of another vessel, to which the master has gone, out of the course of his voyage, for the purpose of affording succor by taking them on board his own vessel, or by other means. 1 Phil. Ins. § 1027, and cases cited.

This principle was fully recognized by this court in *Perkins* v. *Augusta Ins. & Banking Co.* 10 Gray, 312, 316, in which the vessel deviated for the purpose of procuring medical aid for a passenger, and was subsequently lost on the voyage home. As deviation in effect substitutes a new risk for that originally under taken, and involves a liability to incur any and all perils of the

sea, although different from and greater than those to which the vessel and property on board would have been exposed on the voyage insured, it is obvious that these decisions recognize the right of the master to delay and go out of his course for the purposes stated, irrespectively of the perils to which the vessel and cargo may in consequence be subsequently subjected. The doctrine of these cases rests on the highest moral principle, recognizing it as an absolute and paramount duty of a master to relieve human distress and to save life, and to regard the safety of property and all pecuniary considerations as subordinate and immaterial in comparison therewith.

It would manifestly be contrary to this doctrine, or render it ineffective and nugatory in cases where its operation would be most salutary and beneficent, to hold that it did not justify a master in taking passengers into his own vessel from a sinking ship to which he had gone for the purpose of affording relief, although he might in order to do so be compelled to sacrifice a portion of the cargo. The same sense of duty which induced the master to deviate, and to go to the shipwrecked vessel, and justified him in so doing, would operate with like force and effect when he reached the wreck and received on board his own vessel the passengers and crew of the sinking ship. In view of these considerations, we can entertain no doubt that the conduct of the master of the vessel insured, so far from being censurable or unauthorized, was in accordance with the plain dictates of moral duty and humanity, and was fully justified by the circumstances. It follows, that there was no breach of duty or violation of contract.

But this conclusion is by no means decisive of the rights of the parties to this action. Indeed, the counsel for the defendants does not contend that the master of the bark was guilty of any misconduct or breach of duty in stopping to give aid to the shipwrecked vessel, or in receiving her crew and passengers on board. We have gone over this part of the case somewhat at length, lest it might be supposed that we entertained doubts concerning the rights and duties of the master in the exigency under which he acted.

But the important question still remains, whether the throwing over of cargo can be deemed to have been made under circumstances which bring the case within the principles of a general average contribution. It is insisted by the learned counsel for the defendants, and it is the main ground on which he rests his defence to this action, that this throwing over was not occasioned by a peril of the sea, but that the just inference from the facts is that it was made in order to save the lives of the crew and passengers of the shipwrecked vessel. If he is right in this position, there can be no doubt that a claim for contribution cannot be supported. This is conceded by the plaintiff's counsel. A sacrifice of property made for the purpose of rescuing persons from shipwreck on board of another's vessel can in no sense be regarded as made for the common benefit, in order to escape a peril of the sea impending over the subject insured. The case therefore reduces itself to the single question, what in legal contemplation was the cause of the destruction of cargo?

It is to be borne in mind that, in cases of this nature, we are to seek for the direct, immediate and proximate cause, and are not to regard the original cause or any previous link in the chain of causes, which led to the final act. This it is not always easy to do. When events are crowded together, and one succeeds another in rapid succession, each being the effect of some cause and in its turn becoming the cause of ensuing consequences, and all leading to a particular result or act, a nice and careful discrimination may be required in order to disentangle the chain, and ascertain with accuracy the order in which the links were formed. In the case at bar, the interval between the determination of the master to succor the shipwrecked crew and passengers, and throwing over a part of the cargo, was a brief one. Causes operated and consequences followed rapidly. They were all proximate in time. The difficulty is in ascertaining the exact proximity of each in their relations of direct cause and effect. It is also to be remembered that not only must an impending peril be proved to be the cause or occasion of a loss, but that no claim for a general average contribution can be sustained unless it clearly appears that there was a voluntary

and intentional sacrifice of the property lost for the purpose of escaping such peril. It must be made to appear, not merely that present safety was a consequence or result of a voluntary sacrifice, but also that to obtain such safety was the object and motive of the sacrifice. If a loss is incurred for any other purpose, it will afford no ground for a claim to a general average contribution. It is the intention to save the remaining property from a danger which is actually impending and apparently inevitable, which constitutes the very essence of the kind of loss which gives a claim on other interests exposed to hazard for contribution.

In an early case in this court, this principle was enunciated, and it was held that an essential requisite to a right to recover a contribution was, that the benefit to the property saved " was intended as well as obtained." *Whitteridge* v. *Norris,* 6 Mass. 125, 131. In a later case, Putnam, J., in enumerating the necessary elements of a general average loss, says, it must be proved that " the sacrifice was necessary and voluntary, and it must have been intended for the safety of all concerned." *Scudder* v. *Bradford,* 14 Pick. 13, 15. See also 2 Arnould on Ins. (2d Amer. ed.) 883, and note, and cases cited; Abbott on Shipping, 479.

In the case of *The Brig Mary,* 1 Sprague's Decis. 17, it appeared that the cargo had been landed and stored, partly in order to repair the brig, and in part because the cargo was damaged. While in store a portion of the cargo was destroyed by fire. Judge Sprague said : " Shall this be brought into general average ? If it was landed and stored in order to repair the ship, then this new risk was incurred for the general benefit, and should be allowed." " But if it was landed and stored because the cargo was damaged, then the new risk was incurred only for the benefit of the cargo, and the loss is particular average. But the evidence shows that both causes concurred." Upon this case the learned judge clearly and succinctly stated the principles on which a claim for general average rests, thus : " Property is paid for in general average from justice and policy; it is just that he whose property has been sacrificed for the general benefit

should bear no more than his proportion of the loss; it is good policy, because the owner, who may be supposed to be present personally, or by his agent, is thereby induced to make less resistance to an act which is for the common good. But this rests entirely on the supposition that there has been a voluntary and intentional sacrifice for the general benefit." And it was held that although the repair of the ship which was necessary for the common good concurred with the damage to the cargo in causing the loss, it could not be brought into general average.

Bearing in mind these principles, and that the burden of proving a loss entitling the owners of the cargo to a contribution from the vessel rests on the plaintiff, we are to consider whether a just and reasonable inference from the facts stated establishes such a claim. We start with the admitted fact that the bark was in perfect safety, exposed to no extraordinary peril from within or without, till she began to receive the crew and passengers from the shipwrecked vessel. When then did the peril arise, and what was the nature of it? The plaintiff insists that it was the innavigability of the bark; that this was caused by the lawful act of the master in receiving on board such a number of persons as passengers that it " was not possible to handle the bark " while they remained on deck, and that a jettison was made for the purpose of restoring the vessel to a navigable condition. But the difficulty with this statement is, that it not only disregards the exact order of events in their relation of cause and effect as they occurred, but that it also leaves out of view the motive which prompted the master of the bark in ordering a part of the cargo to be thrown overboard. We do not doubt that it would have been impracticable to navigate the bark, if the persons could have been received on board without removing a part of the cargo. But it does not follow that this removal was made for the purpose of restoring her navigability, or that unseaworthiness arising from innavigability was a peril to escape which the sacrifice of a part of the cargo was made. On the contrary, it seems to us that the legitimate inference from the facts is, that the cargo was taken out and thrown overboard

for the purpose of saving the lives of the shipwrecked passen-
gers and crew; that this was the primary and real motive of the
master in directing its destruction, and the immediate and proxi-
mate cause of the loss. We do not mean to say that no claim
for contribution could be supported where property on board had
been sacrificed in view of a peril which was inevitable, merely
because the loss was incurred in anticipation of the actual ex-
istence of a danger which could be averted only by a voluntary
destruction of property. But we do say that the sacrifice must
be made with the intention and for the purpose of avoiding
the impending and anticipated peril; that this must be the
motive and the cause of the sacrifice; and that it is not suffi-
cient to sustain a claim for a general average loss, that it ap-
pears that, if the property had not been destroyed for a purpose
other than the general safety, it would immediately have become
necessary to destroy it for the common benefit.

Upon turning to the statement of facts, it is observable that it
is not stated that the motive or object of throwing over a part
of the cargo was to keep the vessel in a navigable condition.
If such was the fact, it was within the knowledge of the master,
and it was susceptible of clear and irrefragable proof. No sacri-
fice of property for the common benefit could be properly made,
unless the master had, in the exercise of judgment upon the facts
as they existed, determined that the sacrifice was necessary for
the general safety. But it is not stated that any such judg-
ment or opinion was formed. We are left to infer it from
the statement that it was not possible to handle the ship with
the passengers on deck, and that there was not room for them
elsewhere without removing the cargo. This statement how-
ever is to be taken in connection with other facts which tend to
show that the preservation or restoration of the navigability of
the vessel was not the immediate object of the sacrifice. It
appears that as soon as the master determined to take the crew
and passengers of the other vessel on board, he gave orders to
his mate to clear out the oranges from between decks. It is
also expressly agreed that this was done to "make room for the
passengers," it being necessary to keep the women and children

who were the first passengers received on board, upon the deck in a heavy rain, until room could be made for them below. The throwing over of the cargo was in fact begun before any persons were received on board. Certainly the vessel was not then in-navigable, nor can it be said that it was certain she would become so. The removal of the shipwrecked passengers and crew could not be accomplished in a very brief period of time. The master knew that it would necessarily occupy many hours. It was not in fact completed for upwards of seven hours. During this time, it was not impossible that some other vessel might have come to the aid of the bark in rescuing and receiving the passengers and crew, and rendered the sacrifice of a part of the cargo unnecessary. If no other facts appeared, we should entertain strong doubts whether on this statement the plaintiff has established the proposition on which his case depends, of a jettison made in view of an impending peril, and upon a judgment formed by the master that the sacrifice was necessary for the general safety.

But all doubts are set at rest by the further admitted fact, that the passengers and crew from the Gratitude could not have been taken on board the bark at all without a throwing over of the cargo. The whole number of persons received was three hundred and fifty, but only one hundred and fifty could stand on deck. There was no room therefore to receive them, except by a destruction of the cargo which was between decks and in the hold. This was within the knowledge of the master when he determined to take them on board. How then can it be said that there was a jettison made to preserve or restore the seaworthiness of the bark? The unseaworthiness from innavigability did not exist, nor was it anticipated, except as a consequence or result of taking on board the passengers and crew from the wreck; but they could not be received until a part of the cargo was got rid of; as the passengers and cargo could not be on board at the same time, the alleged impending peril of innavigability from the overloading of the bark could not arise. The decision of the master which he communicated to the mate of the Gratitude, and which he immediately

proceeded to carry into effect, was to take all on board, and this necessarily involved the destruction of a part of the cargo, because it was impossible to execute his declared purpose while the whole of the cargo remained on board.

Some confusion in the application of legal principles to the case before us may be occasioned by putting too much stress on the fact that the mode of destruction of part of the cargo was the same as in the ordinary case of a sacrifice for the common benefit, by throwing it overboard. But suppose, when the shipwrecked vessel was overtaken by the bark, it had been found that the passengers had been previously dying from scurvy or from thirst, and it had become necessary, before removing them or while the removal was going on, to use the oranges for the purpose of relieving them from severe and possibly fatal suffering and disease. No one would contend that a destruction of the cargo for such a purpose would constitute any ground for a claim for a general average contribution. The necessary result of this view of the case is that judgment must be entered for the defendants. But there is really no distinction in principle between a case of a sacrifice of a cargo to relieve the passengers from personal suffering and death impending over them from want or disease, and one incurred to make room for them on board the bark in order to preserve them from this suffering and impending death occasioned by their longer continuance on the wrecked vessel. In both cases, the sacrifice is made for the relief and succor of the passengers, and not to obtain present safety from a peril impending over the bark.

Under such circumstances it cannot, in the opinion of a majority of the court, be said that the immediate cause of the destruction of cargo was the innavigability of the vessel, or that it was made by the master with a design to avert this peril. If the goods thrown overboard must have been sacrificed, as the facts show, for the purpose of receiving the shipwrecked persons on board, their destruction was inevitable irrespectively of the innavigability of the vessel. This peril therefore was not the cause of the loss in a legal sense, nor was this common safety the purpose for which the sacrifice of the cargo was made.

FOSTER, J., dissenting.  I find myself unable to concur with the majority of the court, and this seems to be a cause in which I ought to state briefly the reasons of my dissent.

On the afternoon of January 1st 1866, the bark Fredonia was summoned by a signal of distress from the ship Gratitude.  The two vessels kept near each other until daylight of the 3d, when the mate of the Gratitude came on board the Fredonia, represented to her master that the ship was in a sinking condition, and requested him to take off the women and children.  This application was declined, and the mate returned to his own vessel, but soon came back with some of the crew and passengers, who implored the master of the Fredonia to receive the ship's company of the disabled vessel in order to save their lives, as their strength was worn out with pumping, the forward pumps had given out, and the ship must go to the bottom.  Thereupon the master of the Fredonia decided and promised to take them on board.  Having formed this resolution, he ordered the boxes of oranges between decks to be thrown overboard in order to make more room for the passengers and crew of the Gratitude, whose numbers were so great that the Fredonia could not otherwise have been navigated after they were received.  The jettison began before the first passengers arrived, but it was continued afterwards, and their reception and the lightening of the Fredonia proceeded simultaneously.  I do not understand it to be the fair construction of the agreed facts that it was physically impossible to take all the persons from the Gratitude on board the Fredonia without throwing over a part of its cargo, but only that they could not be sheltered and provided for, and must have remained exposed to the storm until the space between decks was cleared for their accommodation.  But in my view of the subject this question is immaterial.

Under these circumstances, the defendants contend that the cargo was thrown overboard merely to save the lives of persons on board another vessel, while the plaintiff claims that the proximate cause of the jettison of the cargo was the innavigability of the Fredonia caused by the great number of persons whom her master had rightfully agreed to receive, and who were actually coming on board at the time the sacrifice was made.

He was certainly under a paramount moral obligation to take on board the passengers and crew of the Gratitude, whose lives would otherwise have been lost. The promptings of nature and the precepts of Christianity alike ordain it as a sacred duty to succor those who are ready to perish. He had also the legal right to perform this act of humanity. The law on this subject is not so at variance with the principles of justice on which all law is founded as to subject the master to a legal liability for the discharge of a moral duty, the neglect of which would have made him infamous among mankind. This legal right necessarily involved the further incidental right to guard against the consequent innavigability of his own vessel, which was sure to be thereby occasioned. A jettison may always be made in view of an impending peril, without waiting for its actual occurrence, which often would be too late. And, when made under such circumstances, it is the subject of a general average contribution. There is no occasion to enlarge upon these familiar principles, or to enforce them by authority. They are fully and explicitly recognized in the opinion of the majority of the court. The moral and legal rightfulness of the master's acts is conceded. The difference of opinion is, whether they constitute a valid claim of general average, and thus establish the liability of the insurers.

No adjudged case can be found, the facts of which resemble those of the present, or in which the reasoning of the court sheds light upon the precise question now under debate. *The Brig Mary*, 1 Sprague's Decis. 17, has been referred to. So much of that case as relates to general average may be stated in a few words, and in the very language of the opinion. " The report of the surveyors ordered the cargo to be landed in order to examine the ship, and it was so much damaged that it could not have remained on board. . . . . In the case before us, the cargo was so damaged as to render its removal from the vessel indispensable. The owner had no option. I cannot therefore consider him as having made a voluntary sacrifice for the pur pose of prosecuting the voyage." I discover nothing in this case of the least value to the present discussion. We must therefore

resort to the general principles of this branch of maritime law, which is founded as well upon considerations of natural justice and of commercial policy as upon the usages of merchants, and ought surely to be applied to new cases in a liberal and enlightened spirit.

It is not denied that, if the passengers and crew of the Gratitude had been actually received by the Fredonia, and immediately afterwards its innavigability had been ascertained and the jettison thereupon ordered, there would have been a plain case of general average contribution, however brief the interval between the two events. Accordingly, as I understand the principles adopted by the majority of the court, their decision of the present case would be reversed, if the ship's company had landed one at a time upon the deck of the bark, and, directly after each came on board, so many boxes of oranges had been thrown over as would make room for his accommodation. But this refinement seems to me too subtle for the wise, practical administration of maritime law. To my mind there is no material distinction between a jettison resolved upon after the master of the Fredonia had rightfully decided and promised to fulfil the duty of rescuing the shipwrecked strangers, and one found to be essential to the common safety the moment after they came on board. When the moral necessity of taking them off the Gratitude had been demonstrated, the promise to do so had been given; and while the transfer was taking place, the ship's company of the Gratitude are in my opinion to be regarded as belonging to the Fredonia as much as after they had reached its deck. If a portion of its own crew and passengers had temporarily left that vessel, and it was found that they could not safely be taken back without a jettison, no one would suppose that it failed to be a subject of general average, merely because the throwing overboard of the cargo preceded their return. And I cannot distinguish in principle such a case from the present. The master had a right to consider what would be necessary for the general safety, when all were on board whom he had the moral and legal right, and had promised, to receive. Under such circumstances, the proximate cause of the jettison seems to me to have been the

innavigability of the Fredonia, produced by the great number of new passengers whom its master had rightfully engaged to receive, and who were actually arriving on board. A peril of the sea was thus incurred in the fulfilment of the duty of saving life, and in consequence of that peril the jettison was made. No doubt the general safety must have been and was the object of the sacrifice. The precise question is, the general safety of whom? I differ from my brethren in thinking that, upon the facts of this case, the common safety included the human beings who were coming from the Gratitude, as well as the original ship's company of the Fredonia.

If this view be correct, the jettison was immediately produced by a peril of the sea, within the most stringent application of the maxim which pervades the whole law of marine insurance, that the proximate cause of a loss is alone to be regarded.

But there are some general considerations not to be lost sight of. It is admitted that the owners of the portion of the cargo destroyed have no legal cause of complaint; and that the master's act was justifiable as against them on the ground of necessity. And I feel it to be impolitic, unjust, and contrary to the general interests of commerce, to lay down a rule by which, under such circumstances, it depends on the arbitrary or accidental selection of the master, whose goods shall be sacrificed and whose shall be saved, without any contribution. The danger and injustice of intrusting such a power to the common agent is one of the reasons on which the doctrine of general average is founded, and it seems to me to apply to the present case as forcibly as to any other.

Furthermore, it is well established that a deviation to save life or succor the distressed does not vitiate a marine insurance, although a deviation to save property on board another vessel always avoids the policy. The doubt on this subject which Mr. Arnould (1 Arnould on Ins. 410) pronounces to have been " dishonorable to the jurisprudence of Christian communities " no longer exists. In regard to it Chief Justice Marshall observes, in *Mason* v. *The Blaireau,* 2 Cranch, 257, note, that " if stopping to relieve a vessel in distress would discharge the underwriters

no master would be justified in using an exertion to save a vessel in the most imminent danger of perishing." It was the opinion of that great magistrate that no moral duty to strangers would warrant a shipmaster in exposing his vessel and cargo to a loss not covered by the policy. But his reasoning and conclusion was, that, because the act of deviation to save life is a paramount moral duty which the master is required by the law of God to perform, therefore the dangers incurred in doing so are to be deemed perils of the sea for which underwriters are liable. This doctrine recognizes the constraining moral necessity of such an act for such a purpose; and considers a peril of the sea met with in its performance as not voluntarily but inevitably incurred. The shipmaster who meets danger or disaster in a rational attempt to rescue shipwrecked fellow beings is driven into it by a force as irresistible to a brave man as that of the winds or the waves. The justification of this rule is said to rest npon the plainest principles of humanity. But a deviation changes the whole character of the risk, and may expose the vessel to every possible peril of the seas. It may render a jettison necessary, and if the deviation is excused so also must be the consequent sacrifice of the cargo. Every consideration which allows a master to turn aside from the course of his voyage to save life would justify a jettison for the same purpose. The same objections may be and have been urged against the liability of the underwriters in that case as in the present. It seems to me that the rule as to deviation commends itself alike to the heart and the head; and that we ought to apply the principles established in that case to a jettison made in obedience to one of the most imperative duties which man can be called upon to perform towards his fellow man.

The language of this court as to the effect of a deviation on the liability of insurers exactly expresses my sentiments in the present case. " It makes no difference whether the object of such departure is to alleviate the distress and administer to the necessities of persons who are lawfully on board, or of strangers suffering from disasters sustained by the loss or wreck of another vessel. The dictates of humanity are as forcible in the one case

as in the other, and it would be strange and unreasonable if the law recognized any discrimination between them." *Perkins* v *Augusta Ins. & Banking Co.* 10 Gray, 316.

I am authorized to say that Mr. Justice Chapman fully concurs in this dissenting opinion.

*Judgment for the defendants.*